08 CV 10806
08 CV 10806

JUDGE STEIN

Cardillo & Corbett
Attorneys for Plaintiff
NORTH CHINA SHIPPING LIMITED
29 Broadway
New York, New York 10006
Tel: (212) 344-0464
Fax: (212) 797-1212
James P. Rau (JR-7209)

RECEIVED
DEC 12 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
NORTH CHINA SHIPPING LIMITED,          :
                                       :
                    Plaintiff,         :        **ECF**
                                       :
          -against-                    :     <u>**VERIFIED COMPLAINT**</u>
                                       :
KC CORPORATION,                        :
                                       :
                    Defendant.         :
----------------------------------------x

Plaintiff, NORTH CHINA SHIPPING LIMITED (hereinafter referred to as "Plaintiff"), by and through its attorneys, Cardillo & Corbett, as and for its Verified Complaint against the Defendant KC CORPORATION (hereinafter referred to as "Defendant") alleges, upon information and belief, as follows:

<u>JURISDICTION</u>

1.   This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

<u>THE PARTIES</u>

2.   At all material times to this action Plaintiff was, and still is, a foreign business entity duly organized and existing under the laws of a foreign country with a registered

Dockets.Justia.com

address at Private Trust Corporation, Charlotte House, P.O. Box N-65, Nassau, Bahamas.

3.     Plaintiff is and was, at all material times, the disponent owner of the M/V NAVIOS MERCATOR (the "Vessel").

4.     At all times material to this action, Defendant was, and still is, a foreign business entity organized and existing under the laws of a foreign country with an address at 2F, 1-11 Song Hyun-Dong Dong-Ku, Inchon, Republic of Korea.

<u>DEFENDANT'S BREACH OF CONTRACT</u>

5.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-4 of this Complaint as if set forth at length herein.

6.     By charter party dated August 1, 2007 Plaintiff time chartered the Vessel to Glory Wealth Shipping Pte. Ltd. ("GWS"), pursuant to which Plaintiff let and GWS hired the Vessel for a period of about one year(the "Charter Party"). A copy of the Charter Party is attached hereto as Exhibit 1.

7.     Upon information and belief, in November 2008, GWS sub-chartered the Vessel to Defendant for the carriage of a cargo of bauxite from Australia to South Korea (the "Sub-Charter Party").

8.     Under the terms of the Charter Party, it was the duty of GWS as charterer of the Vessel to pay hire to Plaintiff

in U.S. dollars at the rate of $43,500 per day from the time of delivery of the Vessel until the date of her redelivery.

9.   The Vessel was delivered to GWS on January 19, 2008 and redelivered on December 2, 2008.

10.   In breach of the Charter Party GWS has failed to pay Plaintiff hire due as required by the terms of the Charter Party for a total amount of $823,509.63.

11.   Under Clause 18 of the Charter Party Plaintiff has a lien on all of GWS's sub-freights for the unpaid hire due under the Charter Party.

12.   Upon information and belief, Defendant owes GWS freights (the "Sub-Freights") under the Sub-Charter Party, which have not yet been paid to GWS by Defendant.

13.   Plaintiff has given notice to Defendant of its lien on the Sub-Freights and has demanded payment of same, but to date these Sub-Freights have not been paid to it.

14.   Despite Plaintiff's repeated demands for payment of the Sub-Freights, Defendant has failed to pay any part of same.

15.   By reason of the aforesaid, Plaintiff has suffered damages in the amount of $823,509.63, so near as the same can be presently estimated, no part of which has been paid although duly demanded.

16.   Plaintiff has commenced arbitration in London against GWS as per the terms of the Charter Party.

17.   By reason of the foregoing, Plaintiff has sustained damages in the amount of $823,509.63.

<u>DEFENDANT NOT FOUND WITHIN THE DISTRICT</u>

18.   Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has or will have during the pendency of this action, property within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, ABN Amro Bank NV, American Express Bank, Bank Leumi, Bank of America, Bank of China, Bank of Communications Co. Ltd. New York Branch, Bank of India, Bank of New York, Barclays Bank, BNP Paribas, Calyon, Citibank, Commerzbank, Deutsche Bank, HSBC (USA) Bank, J.P. Morgan Chase, Standard Chartered Bank, State Bank of India, Societe Generale, UBS AG and/or Wachovia Bank, which are believed to be due and owing to Defendant.

19.   Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims,

attaching, *inter alia,* any property of defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over Defendant, and to secure Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint;

B. That since Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to, ABN Amro Bank NV, American Express Bank, Bank Leumi, Bank of America, Bank of China, Bank of Communications Co. Ltd. New York Branch, Bank of India, Bank of New York, Barclays Bank, BNP Paribas, Calyon, Citibank, Commerzbank, Deutsche Bank, HSBC (USA) Bank, J.P. Morgan Chase, Standard Chartered Bank, State Bank of India, Societe Generale, UBS AG and/or Wachovia Bank, which are due and owing to Defendant, in the amount of $823,509.63 to secure Plaintiff's claims, and that all persons claiming any interest in the same be cited to

appear and pursuant to Supplemental Rule B answer the matters alleged in the Complaint;

   C. That this Court enter judgment against the Defendant in the amount of $823,509.63 for the damages suffered by Plaintiff; and

   D. That Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: New York, New York
    December 12, 2008

       CARDILLO & CORBETT
       Attorneys for Plaintiff
       NORTH CHINA SHIPPING LIMITED

By: _____
   James P. Rau (JR7209)

       Office and P.O. Address
       29 Broadway, Suite 1710
       New York, New York 10006
       Tel: (212) 344-0464
       Fax: (212) 797-1212

# ATTORNEY'S VERIFICATION

State of New York )
                    ) ss.:
County of New York)

       1.    My name is James P. Rau.

       2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

       3.    I am a partner in the firm of Cardillo & Corbett, attorneys for the Plaintiff.

       4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

       5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

       6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

       7.    I am authorized to make this Verification on behalf of the Plaintiff.

_____
James P. Rau

Sworn to before me this
12th day of December, 2008

_____
NOTARY PUBLIC

CHRISTOPHIL B. COSTAS
Notary Public, State of New York
No. 31-0773693
Qualified in New York County
Commission Expires April 30, 2011

# EXHIBIT

# 1

## Eric Chu

发件人： North China Shipping - Steven Jia [jia@northchina.com.hk]
发送时间：2008年8月7日星期四 17:56
收件人： Chu Rong Huan
主题： Fw: FW: steve/vivien— MV.NAVIOS MECATOR / GLORY WEALTH

----- Original Message -----
From: Vivien Yang
To: North China Shipping-Steven Jia
Sent: Thursday, August 07, 2008 4:31 PM
Subject: FW: FW: steve/vivien-- MV.NAVIOS MECATOR / GLORY WEALTH

STEVEN/VIVIEN,

THANK YOU FOR YR CALLING. AS THE BROKER OF NCS/GLORY WEALTH C/P DATED 31ST
JULY 07, I CONFIRM THE FOLL RECAP IS THE CLEAN RECAP.

ANY FURTHER QUERY, PLS FEEL FREE TO CONTACT ME.

**From:** Vivien.Yang@clarksons.com
**Sent:** 31/07/2007 16:13:36
**To:** jia@northchina.com.hk;
**Subject:** steve/vivien-- MV.NAVIOS MECATOR / GLORY WEALTH

STEVE JIA/YANG YI

RE:MV MAVIOS MERCATOR/GWEALTH

FOLL IS TERMS AGREED SO FAR,

- ALL THE NEGOTIATIONS TO BE KEPT PRIVATE & CONFIDENTIAL
- OWRS: NORTH CHINA SHIPPING LTD BAHAMAS
- A/C: GLORYWEALTH SHIPPING PTE LTD
- MV NAVIOS MERCATOR
DESC AS PER ATTACHED BTB HEAD C/P  AS ATTACHED
- DELY DROPPING LAST OUTWARD SEA PILOT AT 1 SAFE PORT WORLDWIDE -IF PG
THEN PMO OR IF RED SEA THEN PASSING ADEN ATDNSHINC -IN OWRS' OPTION
- LAYCAN: 29 OCT 2007 TO 10 FEB 2008
- L/C TO BE NARROW TO 15 DAYS SPREAD 20 DAYS PRIOR TO VSL DELY
- TC PERIOD MIN/MAX 1 JAN 2009 - 12FEB 2009
- REDEL RANGE AS PER ATTACHED CP
- HIRE USD 43500 DAILY DIOT
- 2.5% ADD  + 1.25% TO CLARKSONS

OWSIE AS PER ATTCHED C/P WITH LOGICALLY AMENDED EXCEPT

CLAUSE 35, LAST WORD "ARAILABLE" TO BE REVISED AS "AVAILABLE" (GUESS
IT'S TYPING MISTAKE.)

CLAUSE 54. HOLD CONDITION OF DELIVERY  / REDELIVERY:
AMEND TO READ  CHRS TO PAY LSUM USD4500 PER VOYAGE FOR INTERMEDIATE
HOLD CLEANING  EXCL
DUNNAGE/LASHING DISPOSAL HOWEVER IN CASE OF DIRTY CGOES CHRS TO PAY
USD8000 PER VOYAGE

CLAUSE 61. BUNKERS
BUNKER ON DELIVERY:ABT  IFO 570 MTS / ABT MDO 65 MTS
BUNKER ON REDELIVERY ABOUT THE SAME AS BOD
PRICES USD360 PMT FOR IFO(380CST) AND USD650 PMT FOR MDO
BUNKER SPEC: IFO 380CST 8217 1996 (RMG 35)
OWSIE PER CP CLS

CLAUS 76: DELETE

CLAUSE 83 BULK CEMENT PROTECTIVE CLAUSE:
K) LAST SENTENCE AMEND TO READ 'IN CASE OF BLK CEMENT LOADING
INTERMEDIARY HOLD CLEANING TO
BE USD2000 PER HOLD.'

END

BRGDS


This email (including any attachments) is confidential and may also be privi

Whilst we have taken reasonable precautions to ensure that this e-mail and a

The Clarkson group of companies operating in the UK includes: Clarkson PLC (

This email (including any attachments) is confidential and may also be privileged. It is intended solely for the use of the named addressee(s). If you are not the intended recipient, you may not copy,forward, disclose or otherwise use this email or any of its attachments - please notify the sender immediatly and then delete this email and any attachments.

Whilst we have taken reasonable precautions to ensure that this e-mail and any attachment(s) have been checked for viruses, we cannot guarantee that they are virus free and we do not accept liability for any damage sustained as a result of viruses, and you should carry out your own virus checks.

The Clarkson group of companies operating in the UK includes: Clarkson PLC (reg no. 1190238); H Clarkson & Company Ltd (reg no. 152738); Clarkson Securities Ltd (reg no. 3052018); Clarkson Research Services Ltd (reg no. 1944749); Clarkson Fund Management Ltd (reg no. 3819845); Clarkson Financial Services Ltd (reg no. 3930010) and Clarkson Technical Services Ltd (reg no. 5960293). Clarkson Securities Ltd and Clarkson Fund Management Ltd are authorised and regulated in the UK by the Financial Services Authority. Each of the aforementioned is registered in England and Wales and has its Registered Office at St. Magnus House, 3 Lower Thames Street, London EC3R 6HE and is included in the Group VAT Registration, No. GB245903556.

# Time Charter

### GOVERNMENT FORM
### Approved by the New York Produce Exchange
### November 6th, 1913-Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1. **This Charter Party,** made and concluded in.......... *Seoul,* .................. *8th* ....day of ....... *August,* .........2006...19..........
2. Between....*Mercator Shipping Corporation,*............................................................................................
3. Owners of the good...... *Panama flag* ....... ~~Steamship~~/Motorship *"NAVIOS MERCATOR"* ............ of
4. ~~of ........ tons gross register, and ............ tons net register, having engines of ................. indicated hours-power~~
5. ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed .........................................................~~
6. ~~at........ of about ......... cubic feet bale capacity, and about ................... tons of 2240 lbs.~~
7. ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~
8. ~~allowing a minimum of fifty tons) on a draft of ............feet .......inches on .... Summer freeboard, inclusive of permanent bunkers,~~
9. ~~which are of the capacity of about...........................................tons of fuel, and capable of steaming, fully laden under good weather~~
10. ~~conditions about...........knots on a consumption of about........tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,~~
11. now ..................................................................................................................................................
12. ........................ and ......... *KOREA LINE CORPORATION*.....Charterers of the City of ....... *Seoul, Korea* .....................
13. **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14. ~~about..~~ *minimum 23months to about 26months time charter (about being 15days more Charterers' option)*
15. *via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits* within below mentioned trading limits.
16. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17. the fulfillment of this Charter Party.
18. Vessel to be placed at the disposal of the Charterers, at *world wide, any time day or night Sundays and holidays included.*
........................................................................................................................................................
19. ........................................................................................................................................................
20. ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as~~
21. ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5.~~ Vessel on her delivery to be
22. ready to receive cargo with clean-swept, holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and
23. donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25. dise, ~~including petroleum or its products, in proper containers,~~ excluding ... *See Clause 51*...........................................................
26. ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27. ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28. ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29. ~~Mexico, and/or South America..........................................................................................~~ ~~and/or Europe~~
30. ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31. ~~October 31st and may 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32. *See Clause 52-Trading Exclusions*.................................................................................................
33. ........................................................................................................................................................
34. ........................................................................................................................................................
35. as the Charterers or their Agents shall direct, on the following conditions:
36. 1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *drinking water, lubrication oil and garbage due, if not compulsory,* boiler water and maintain her class and keep
38. the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection necessary to comply with current requirements at port of call and canals* for and during the service.
39. 2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary* Pilotages, *Boatage on Charterers' business,* Agencies for *Charterers' business,* clearance and cargo purpose only, Commissions,
40. Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41. a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42. illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried *and/or cargoes intended to be carried,* or ports visited while vessel is employed under this
43. charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44. of six months or more.

1

45.     Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46. Owners to allow them the use of any dunnage, *lashing materials as on board* and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47. for dunnage, they making good any damage thereto.

48.     3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49. board the vessel ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~...........tons and not more than

50. ..................tons ~~and to be re-delivered with not less than~~............................tons ~~and not more than~~..................tons. *See Clause 61.*

51.     4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of......*USD* .- *daily including overtime payable with 15*

52. *days in advance,* in United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53. ~~stores, on..........summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54. and after the same rate for any part of a *day* ~~month,~~ hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55. wear and tear excepted, to the Owners (unless lost) ~~at~~ .....*See Clause 101.*.................................................................

56. ................................................................................................unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15/10/5* days *approximate- all going well except unforeseen circumstances including but not limited to change of berthing turns at port of discharge* .............................................................................

57. notice of vessels expected date of re-delivery, and *definite* port ~~probable~~ *and definite redelivery notice 5/3/1 day(s) before redelivery.*

58.     5. Payment of said hire to be made in *as per Clause 89* ~~New York~~ in cash in United States Currency, *every 15 days* ~~semi-monthly~~ in advance, and for the last *15days* ~~half-month~~ or

59. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60. due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61. hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63. ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64. ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65.     Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66. to 2½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67. of such advances.

68.     6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *in port elsewhere* that Charterers or their Agents may

69. direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70. lie aground. *See Clause 99*

71.     7. That the whole reach of the Vessel's Hold, Decks*(See Clause 51)*, and usual places of loading (not more than she can reasonably stow and carry), also

72. accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73. tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74. ~~paying Owners.........per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75. ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76.     8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78. agency; and Charterers are to load, stow, *tally* ~~and~~ trim *secure and discharge(including extracting the cargo to a readily accessible point)* the cargo at their expense under the supervision of the Captain, who, is to sign, Bills of Lading for

79. cargo as presented, in conformity with Mate's or ~~Tally Clerk's~~ receipts.

80.     9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82.     10. That the Charterers shall have permission to appoint a Supercargo who shall accompany the vessel and see that voyages are prosecuted

83. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84. rate of *USD12.00* ~~$1.00~~ per day *for supercargo.* ~~Owners to victual~~ Pilots and Customs Officers, ~~and also, when authorized by Charterers or~~

85. ~~their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate for meal, for all such victualling.~~

86.     11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88. terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs *in English*, showing the course of the vessel and distance run and the con-

89. sumption of fuel.

90.     12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91.     ~~13. That the Charterers shall have the option of continuing this charter for a further period of~~.............................................

92. ...........................................................................................................................................................

2

93. ~~on giving written notice thereof to the Owners or their Agents......................days previous to the expiration of the first named term, or any declared option.~~

94. 14. That if required by Charterers, time not to commence before *1st October, 2006* ....and should vessel

95. not have given written notice of readiness on or before *30th October, 2006(to be narrowed to 15day spread with delivery), Owners to give Charterers 25/15/10days approximate notice of expected delivery range and 5days definite notice of expected port and date of delivery* .......~~but not later than 4 p.m.~~ Charterers or

96. their Agents to have the option of canceling this Charter at any time not later than the day of vessel's readiness.

97. 15. That in the event of the loss of time from deficiency *and/or default* of men *including strikes of Officers and Crew whether due to labour disputes* or *otherwise at deficiency of* stores, fire, breakdown or damage to hull, machinery or equipment,

98. grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99. *unless such causes due to Charterers and/or their Agent and/or their servants* preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101. thereof, and all extra expenses shall be deducted from the hire.

102. 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106. purpose of saving life and property.

107. 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New York~~

108. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *This Charter Party shall be governed by the Englishi Law. It is agreed that claims below USD50,000 excluding interest and cost shall be settled as per LMAA Small Claims procedure 1989 and any amendments thereto.*

110. 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113. might have priority over the title and interest of the Owners in the vessel.

114. 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115. Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116. York-Antwerp Rules *1994 and any subsequent amendments thereto* ~~1924, at such port or place in the United States as may be selected by the carrier,~~ and as to matters not provided for by these

117. Rules, according to the laws and usages at the port of *London* ~~New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119. ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120. ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121. ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122. ~~required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in special account at the~~

124. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125. ~~United States money.~~

126. ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128. ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129. ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131. ~~ships belonged to strangers.~~ *Charter Hire not to contribute to General Average. .*

132. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133. 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the

134. cost of replacing same, to be allowed by Owners. *Bunker consumed during off-hire to be for Owners' account at Platt's nearest posted prices but maximum agreed Charter Party prices.*

135. 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136. ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137. ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138. *See Clause 58.*...................................................................................................................................

139. .......................................................................................................................................

140. 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes ~~derricks~~) capable of handling lifts *as per Clause 29*

3

141. ~~up to three tons~~, also providing ropes, falls, slings and blocks *as on board*. If vessel is fitted with *cranes* ~~derricks~~ capable of handling heavier lifts, Owners are to provide necessary gear for

142. same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as on board* ~~lanterns and oil~~ for

143. night work, *free of expense to the Charterers*. ~~and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The

144. Charterers to have the use of any gear on board the vessel.

145. 23. Vessel to work night and day, if required by Charterers, and all *cranes* ~~winches~~ to be at Charterers' disposal during loading and discharging;

146. ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147. ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles.~~ If the rules of the

148. ~~port, or labor unions, prevent crew from driving winches,~~ shore Winchmen to be ~~paid~~ by Charterers. In the event of a disabled winch or winches or

149. insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned

150. thereby.

151. 24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

152. ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

153. ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

154. ~~of which are to be included in all bills of lading issued hereunder:~~

155. U.S.A. Clause Paramount

156. ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157. ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158. ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159. ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160. ~~Both to Blame Collision Clause~~

161. ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

161. ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried~~

162. ~~hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her Owners in so far as such loss~~

163. ~~or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-~~

164. ~~carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~

165. ~~Owners as part of their claim against the carrying ship or carrier.~~

166. 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168. drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169. 8 port or to get out after having completed loading or discharging. *Vessel not to force ice, nor follow ice breakers.*

170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the

171. navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading for their own account.

172. 27. A commission of *1.25* per cent is payable by the Vessel and Owners to.........

173. ................................................................................................

174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175. 28. An address commission of *2.5* per cent payable to......... *Charterers* .........on the hire earned and paid under this Charter.


*Additional Clauses No.29 to 101, both inclusive, as attached, to form part of this Charter Party.*


Charterers                                    Owners

4

# ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC CHARTER PARTY DATED 8TH AUGUST, 2006

**Clause 29     Vessel's description**
NAVIOS MERCATOR
GEARED SINGLE DECK BULK CARRIER
PANAMA FLAG BUILT 2002
53,553 MT DWT ON 12.30 , SSW
LOA/ BEAM: 189.94/ 32.26 M
GRT/ NRT: 29,988/ 18,409
TPC: 55.3 AROUND SUMMER DWT
GRAIN/ BALE: 68,927.4 m3/  65,526.4 m3
5 HOLDS/ 5 HATCHES
HATCH SIZE 1-5:  21.12m X 17.6 m
4 x 30.5 MT SWL CRANES
4 x 12.0 m3 GRABS
SP/ CONS: ABOUT 14.5 KTS (B)/ 14 KTS (L) ON ABOUT 30.3 MT IFO (380 CST) FOR
MAIN ENGINE + 1.5 MT PER DAY IFO FOR AUXILIARY
IN PORT IDLE 2.5 MT IFO PER DAY
IN PORT WORKING 5.5 MT IFO PER DAY
VESSEL WILL BURN MDO WHILST MANEUVERING, SAILING, NAVIGATING IN RESTRICTED/
SHALLOW WATERS, CANALS AND OR RIVERS AND OR STAND-BY

ALL DETAILS ABOVE GIVEN ABOUT AND WITHOUT GUARANTEE

**Clause 30     War Risk Insurance**
Basic war risk insurance premium for world-wide trading shall be for Owners' account and additional
premium for war risk on hull and machinery and Officers' crew due to the vessel's trading to the restricted
area shall be for Charterers' account.

Such extra insurance, is payable against presentation of original invoice(s) from Owners underwriters, and
shall not exceed amount charged had the vessel been entered in Lloyds of London underwriters.

**Clause 31     Cuba/Israel/Yugoslavia Call and Arab Blacklist:**
The Owners also guarantee that the Vessel is not blacklisted by any Arab country. The Owners also
guarantee that Vessel does not have any relationship or connection with Yugoslavia, Serbia, Montenegro
or any Yugoslavian, Serbian or Montenegro interest.

**Clause 32     Boycott:**

Should the Vessel be boycotted, picked, black-listed or similar incident at nay port or place by shore
and/or port labours and/or tugboats and/or pilots, or by government and/or any authority by reason of port
state control of a country the Vessel calls by reason of the Vessel's flag, registry, manning or Ownership or
terms and conditions on which members of the Officers/crew are employed, or by reason of trading of this
Vessel or by reason of the Vessel's construction and/or her cargo gear and/or her fitting and/or other
equipment, all consequences and any extra expenses incurred therefrom to be for Owners' account and the
Charterers are entitled to place the Vessel off-hire for any time lost by such reason.

**Clause 33     Grace Period:**

Where there is any failure to make "punctual and regular payment" of hire, the Charterers shall be given
the Owners three(3) day written notice to rectify the failure, and when so rectified within those (3) days
following Owners' notice, the payment shall stancd as reqular and punctual and the Owners will not
withdraw the Vessel.


Everwise
International Co., Ltd.

# ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
## CHARTER PARTY DATED 8TH AUGUST, 2006

**Clause 34        Deratting Certificate:**

The Vessel shall be delivered with valid deratting exemption certificate. If such certificate does not cover the whole period of this Charter, costs of renewal of certificate and fumigation on the Vessel, if necessary, shall be for Owners' account. Any detention and extra expenses incurred thereby shall be also for the Owners' account.

**Clause 35        Quarantine/Radio Pratique:**

Normal quarantine time and expenses for the Vessel's entering port shall be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness, etc, of Master, Officers and crew shall be for Owners' account. Further, the Vessel shall be in possession of normal valid certificate necessary to prepare Radio Pratique at port or ports where Radio Pratique is available.

**Clause 36        Health Certificate:**

The Vessel shall be in possession of necessary certificates to comply with Safety and Health Regulations and all current requirements at all ports call during this Charter. The Master, Officers, and crew of the Vessel hold vaccination certificates against yellow fever, cholera, etc.

**Clause 37        Cargo Gear and Equipment:**

The Vessel's cargo gear and all other cargo handling equipment shall comply with the reaulations and/or requirements in effect at port or ports of call and canals and countries in which the Vessel will be employed. The Owners also guarantee that the Vessel shall be at all times in possession of valid and up-to-date certificate on board to comply with such regulations and/or requirements.

A particular reference is made to U.S. Department of Labour safety and Health Regulations set forth in Part III code of the Federal Regulations, and also all Australian Naviagation(Loading and Unloading Safety Measures)Regulations, 1961 or any amendments thereto and related requirements and recommendations.

If stevedores, longshoremen and other labours are not permitted to work reason of any failure of the Master, Owners and/or their agents to comply with such regulation, or by reason that the vessel is not in possession of such valid and up-to-date certificates, then Owners shall take immediate corrective measure. Charterers shall suspend hire for time lost thereby and any extra expenses including stevedore standby time shall be for Owners' account.

**Clause 38        Bottom Fouling:**

If the vessel's speed capacity is reduced as a result of the bottom growing fouled by reason of the vessel being in a port in a tropical zone for a period in excess of 30days and 40days if non tropical port, the Owners are not to be responsible for reduction in speed of the vessel up until such time as her next scheduled dry dock.

**Clause 39        WWF/Hold Ladder:**

The Owners guarantee that the construction of the Vessel with her cargo gear, fittings and other equipment shall comply with the requirements and/or recommendations of Australia/New Zealand shore labours and pilots.

The Vessel to be fitted with Australian Hold ladders on delivery and during the whole period of this Time charter.

6


Everwise
International Co., Ltd.

**Clause 40    Stevedore Damage:**

Stevedores to be appointed and paid by the Charterers but to work under supervision of the Master.

The Charterers shall not be responsible for any damage caused by stevedores to the Vessel unless the Master notifies the Charterers or their Agents of such damage within 24hours from the occurrence except hidden damage, which should be notified within 24hours from when detected. Should a stevedore damage be caused, Master is obliged to try to let stevedores repair the damage and to try to settle the matter with them in the first stage. Failing this, Mater will endeavor to obtain signed acknowledgement of the damage and liability for the same of the stevedores.

The Charterers shall have the liberty to redeliver the Vessel without repairing the damages for which the Charterers are responsible, as long as the same does not affect the Vessel's seaworthiness and Owners' next voyage arrangement, but the Charterers undertake to reimburse costs of repair against the production of repair bills by repairers or drydock unless otherwise agrees.

Provided proper notice has been given as above, Charterers to remain ultimatedly responsible for stevedore damage.

**Clause 41    P and I Club:**

The Owners guarantee that the Vessel shall be fully covered by a P and I Club, Owners may, if they so desire, change clubs during the currency of this Charter. New club to member of international group.
P and I club is: UK P & I. But always may change clubs curing the currency of this Charter.
The Charterers have the benefit of the Owners granted by the P and I Club as far as the rules permit.

**Clause 42    Nype Interclub Agreement:**

Liabilities for cargo claims shall be borne by the Owners and the charterers in accordance with NYPE Interclub Agreement in February 1970 and its reprints of May 1972, and May 1984, and amendments thereto.

**Clause 43    Owners' Agents:**

The Owners shall appoint their own Agents to attend, if  necessary, Owners' matter, such as delivery, redelivery, General Average, dry-docking, hospitalization, repatriation of crew, repair, supply of the Vessel's sotres and provisions, etc. In case Owners are unable to arrange same, Charterers to agree to have their Agents attend such matter with Owners paying actual expenses and agency fee according to Charterers' agents' tariff. It is understood and agreed that Charterers' Agents will attend Owners' minor affairs such as delivery of cash to Master, crew mail, transportation, etc. without carging agency fee, if tariff allows it, but Owners to reimburse actual outlays to Charterers against production of vouchers.

**Clause 44    Deduction:**
Charterers are entitled to deduct from last sufficient hire payment estimated Owners disbursements which shall be limited to USD1,000.00per port, which to be settled as soon as possible as well as value of estimated quantity of bunkers on redelivery. In case Owners appoint their protective agent, Charterers cannot deduct disbursement for this port.

Charterers also shall be entitled to deduct from last hire payment estimated bunkers on redelivery and Owners' accounts which to be settled within three months after the vessel's redelivery.

**Clause 45    On/Off Hire Survey:**



## ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC CHARTER PARTY DATED 8TH AUGUST, 2006

On- and Off- hire survey shall be carried out by ones surveyor who is acceptable to both parties at delivery or first loading port in Charterers' option and redelivery port respectively to ascertain the Vessel's hull and hold conditions and bunkers remaining on board, the cost being shared equally, but any auctual time lost for on-hire survey to be for Owners' account and off-hire survey for Charterers' account.

**Clause 46    Replenishment of Bunkers:**

Replenishment of bunkers is arranged and paid for by Charterers but always under the supervision and responsibility of the Master provided oil spillage, if any, is not due to the negligence of the bunkers supplier and/or operator. The Master shall pay due diligence for replenishment of bunkers so as not to cause oil spillage while bunkering.

**Clause 47    Oil Pollution:**
1) Owners warrant that throughout the currency of this Charter, they will provide the Vessel with following certificates:

   (A) Certificates issued pursuant to Section 311( P of the US Federal Water, as amended [Title 33 US Code, Section 1321(P)] up to (insert the date upon with such certificate(s) is/are due to expire).

   (B) Certificates issued pursuant to Section 1016(A) of the Oil Pollution Act 1990, and Section 108(A) of the comprehensive environmental response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from(indicate the earliest date upon which the Owners may be required to deliver the Vessel into the Charter or, if later, the date inserted in sub-paragraph (A) above, so long as these can be obtained by the Owners from or by (identify the applicable sucheme or schemes).

2) Notwithstanding anything whether printed or typed herein to the contrary:

   (A) Save as required for compliance with paragraph 1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect pollution damage to enable the Vessel lawfully to enter, remain in any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

   (B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expenses(including but not limited to the costs of any delay incurred by the Vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain or leave any port, place or waters other than to the extent provided in paragraph 1) hereof.

3) Charterers shall bear no responsibility for all consequences (including fines if any imposed to Charterers) of oil or other pollution damage emanating from vessel resulting from Owners negligence and any time lost due to such pollution of oil or its consequences shall be deemed off-hire.

   Owners warrant that the vessel performing under this charter fully complies with Oil Pollution Act 1990 and United States Coast Guard Regulations currently in force at the time of delivery. In case of new laws or regulation introduced to the trade incurring substantial risks or expenses to Owners, Charterers and Owners shall discuss in a bona fide spirit terms of complying to a new requirement.

**Clause 48    Deviation/Put Back:**

8


Everwise
International Co., Ltd.

Should the Vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the Vessel, or dry-docking or periodical survey, or deviates from the course of the voyage caused by sickness or accident to the Master, Officers, crew or any person on board the Vessel other than persons traveling by the Charterers' request, or by reason of sending stowaway or refugee, salfage including saving life or by reason of the refusal of the Master, Officers or crew to do their duties, or any Owners' matters, the payment of hire shall be suspended from the time of inefficiency import or at sea until the Vessel is again efficient in the same position or regain a point of progress equivalent to and/or a point not less favorable to Charterers that the hire ceased hereunder.

Bunkers consumed while the Vessel is off-hire shall be for Owners' account at Platt's nearest posted prices but max agreed Charter Party bunker prices.

### Clause 49    Capture, Seizure, Arrest:

Should the Vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the Charterers or their Agents. Any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for Owners' account.

### Clause 50    Smuggling

Any delay, expenses and/or fine incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew, or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or Agents. Contraband found within the cargo stow and vessel holds shall be construed as Charterers' responsibility until proven otherwise.

### Clause 51    Cargo Exculsions:
Vessel can be employed in carry lawful merchandise cargoes but excluding injurious, flammable and dangerous goods, and always excluding cargoes restricted by as follows:

Acids, aggregates are only allowed as limestones and granites provided maximum 6" diameter and harmless/non-dangerous as per BC Code, ammonium nitrate, ammonium sulphate (however fertilizers grade is allowed), ammunition, arms, asbestos goods, asphalt, bank notes or other negotiable instruments, bones, borax, bullion, calcium carbide, calcium hypochlorite, camping caravans, canary seed, carbide, carbon black in bulk, castor seed, charcoal in gunny bang, clay, containers, copra pellets, copra, cotton, creosoted goods, damaged or second hand goods, dangerous, injurious and inflammable goods, dischlorphenol, direct reduced iron ore pellets, esparto, expellers, explosives, ferro silicon, fibers, fishmeal, furnace slag, glass, gluten feed pellets, groundnuts, H.B.I hemp, hides, not and cold moleded briquettes, iron briquettes, jute, livestock, logs, manioc pellets, military equipment, mineral sands, motor blocks, motor spirit, naphtha, nigerseed, expellers, nuclear and radioactive materials or products or their waste, old rails, pencil pitch, petroleum products, pitch, prefabricated and mobile buildings, quenbracho extract, railway wagons, rare metals and precious objects, raw vegetables or fruit, resin, rutile, saltpeter, scrap, silicon manganese, silicon, soda ash, sodium nitrate, sodium sulphate, sponge iron, sugar ex Mexico, sunflower seed expellers, swarf, tar, tobacco, toxico or chemical waste, trailers, turnings, turnpentine, unprotected pipes, war material of any kind, wheatflour, bulk cement, sulphur, yachts, zinc ash, dangerous goods or substances listed in the IMO-IMDG Code 1994 consolidation edition and subsequent edition thereof or amendments thereto. All cargo carried to comply with latest IMO and local regulations.

For loading concentrates the stowage to be within vessel's strength. All necessary separation if required to



## ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
## CHARTER PARTY DATED 8TH AUGUST, 2006

be properly erected up to surveyor's and Master's satisfaction at Charterers' expense and time and cargo to be loaded, stowed, separated, trimmed and discharged etc., according to latest IMO and local authorities regulations. At Master's request, Charterers to allow Owners to appont P and I surveyor or independent surveyor to supervise loading, stowing, execution of separation, etc., to surveyor's agreement and Master's satisfaction at Charterers' time and expenses.

Charterers to supply vessel shippers certificate of transportable moisture limit and cargo moisture content evidencing cargo compliance with latest IMO regulation. After loading, cargo must be properly trimmed at Charterers' time and expense to surveyor's and Master's satisfaction.

During loading, Master has the right to stop loading and close the hatches if rain affects concentrates moisture content. Any such stoppage is not considered to be off-hire under this Charter Party.

Charterers are allowed to load two cargoes of petcoke per annum provided this not to be the last cargo.

Maximum 2 cargoes of salt and/or sulphur are allowed per annum and such cargo not to be the last cargo prior to redelivery. Charterers are permitted to load only lump and coarse-grained sulphur formed to a specific shape (e.g. prills, granules, pellets, pastilles or flakes) provided, however that the same should be loaded always in accordance with IMO and SOLAS regulations. 'Fine grained sulphur', 'Sulphur of molten' and 'flowers of sulphur' should always be excluded.

In case of salt and/or sulphur loading Charterers to arrange vessel's holds to be lime washed in strict accordance with IMO and/or local regulations/and to Master's satisfaction.

The holds should be thoroughly washed down with freshwater before limewashing at charterers' time and expense.

The cargo is to be loaded, carried and discharged in accordance with IMO or equivalent safely regulations.

The vessel's holds, intended for carriage of salt and/or sulphur, will be limewashed on the tank tops, side shells and bulkheads.

Such operation is to be carried out in Charterers' time and expense. If Charterers wish vessel's crew to carry out such limewashing, then Charterers to pay Owners USD500per hold in lieu thereof, excluding materials which to be supplied and paid by Charterers.

If sufficient materials and/or equipment and/or sufficient time is not available or inclement weather conditions prevail which prevent such lime washing to be completed prior to vessel's arrival at loading port, then crew are to complete limewashing as soon as possible after vessel's arrival at loadport, and always provided shore/local regulations/authorities permit.

If shore regulations do not permit crew to complete the task, then shore labour to be employed at Charterers' time/risk and expense. The vessel will remain on-hire at all time during such operation(s) and crew not to be considered as Charterers' servants and Owners not to be responsible in case vessel's holds will not pass the required inspection, if any prior to salt and/or sulphur loading.

Immediately after discharge of salt and/or sulphur cargo holds to be swept clean of all cargo and limewash residues and holds to be thoroughly washed with fresh water and in any event all cargo and all limewash traces to be removed by Charterer up to the grain standard at their time and expense, to Master's/Owners' satisfaction and vessel shall remain on hire until all such operations are completed.

Intermediate hold cleaning after salt and/or sulphur to be adjusted to USD8,000 lumpsum. In any cases, Owners not to be responsible if vessel's holds will not pass the required inspection after intermediate hold cleaning for her following voyage before redelivery.



# ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
## CHARTER PARTY DATED 8TH AUGUST, 2006

Owners have option that the Charterers to use HOLD BLOCK product instead of lime washing, if available.

During this Charter Party, Charterers are allowed to load total 5(five) cargoes per annum among of Bulk Cement (max 3 cargoes), Cement Clinker or Shredded/HMS 1+2 scrap (max 3 cargoes and always non oily, no motor blocks and turnings) and such cargo not to be the last cargo prior to redelivery. First few layers of scarp to be lowered gently to the tanktop to Master's satisfaction to make proper cushions to avoid damage on tank tops. No dump loading allowed.

No on deck cargoes are allowed.

Charterers are allowed to do max 3X3 coastal consecutive shuttle trades per annum, but each 3 coastal shuttle not to be on consecutive basis.

Owners allow one cargo of bagged Ammonium nitrate fertilizer grade per annum.

### Clause 52    Trading Exclusions

Madagascar, Sri Lanka, Albania, all former Yugoslavia, Israel, Lebanon, Libya, Liberia, Syria, Cambodia, Myanmar, North Korea, Russian Pacific ports, Iraq, Iran, Benin, Congo, Equatorial Guinea, Guinea Bissau, Sierra Leone, Zaire, Pakistan, Eritrea, Ethiopia, Israel, North and South Yemen, Somalia, Cuba, Haiti, El Salvador, Abkhazia, Angola, Mauritania, Algeria, Cape Horn in Winter, Orinoco River, all war/warlike areas prohibited by country of registry or areas prohibited by the United States. Angola is excluded, but Charterer can trade to Luanda only.

Vessel not to trade or do passages directly between China and Taiwan.

Conwartime 1993 War Clause to apply.

Vessel not to trade in area(s) ort(s) having ice or ice like conditions. Vessel not to force nor to follow icebreakers.

Vessel not to be sub-chartered to companies based in Nigeria, Cuba, Pakistan and Israel or any other country which may lead to subsequent boycott of the Vessel.

Pakistan and Sri Lanka continue to be excluded, however, should political climate change, in either of these countries, in a manner decreases war and or security threats/risks to the vessel, then Charterers may request that Owners review this exclusion on a case by case basis extra insurance, costs or lost time of whatsoever nature to be for Charterers account,

Orinocco river not west of Matanzas allowed when not for loading HBI/DRI.

### Clause 53    Gangway Watchmen:

Compulsory or shore watchmen arranged/ordered by Charterers or their Agents to be for Charterers' account, but if required by Master/Vessel, to be for Owners' account.

### Clause 54    Hold Condition of Delivery/Redelivery:

On delivery time, Vessel's holds to be clean, swept, washed down by fresh water and dried up so as to receive Charterers' any permissible cargo in all respects, free of salt, rust scale and grain resides and previous cargo residues to the satisfaction of mutually agreed independent surveyors. Should the Vessel not be approved by surveyors, then the Vessel to be placed off-hire from failure of inspections until Vessel is fully accepted, and proven any additional expenses thereof to be for Owners' account.



## ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
## CHARTER PARTY DATED 8TH AUGUST, 2006

On redelivery, Charterers to redeliver the Vessel paying lumpsum USD5,000.- in lieu of hold cleaning excluding dunnage and lashing disposal.

Intermediate Hold Cleaning
Upon completion of discharge of each cargo, the crew shall render customary assistance in cleaning all cargo compartments in preparation for the next cargo, if required by Charterers and if not prevented by any regulations or agreement whatsoever. Such cleaning work shall be performed while the vessel is enroute from last discharging port to the next loading port provided duration of such voyage sufficient and weather permits, and to be safely done in the same efficient manner as if vessel was trading for Owners' account. Charterers shall pay owners a lumpsum USD900/hold for such cleaning is performed each time excluding dunnage/lashing disposal and USD4,000.-/voyage to Owners however additional hold cleaning for dirty cargoes which to be covered with details. Owners will endeavor to effect such cleaning vest possible but without any guarantee that holds will be sufficiently cleaned/accepted at the loading port and the Owners shall not be responsible for any consequences arising from the fact that the crew has been employed in cleaning.

Owners guarantee that Vessel's holds are clear of any fittings/super-structures such as car-deck, curtain plates whatsoever.

### Clause 55   Preparation for Loading/Discharging

Opening and closing of all hatch covers shall be performed by the Officers and crew, unless prohibited by port regulations, in addition to usual operations performed by them, opening/closing to be free of charges.

The Owners and the Master to undertake best efforts to cooperate with Charterers for the best stowage of cargo.

### Clause 56   Paramount Clause:

Clause Paramount, U.S. Clause Paramount, Canadian Clause Paramount, U.K. Clause Paramount, Hague Rules and/or Hague Visby Rules, wherever applicable, or any national legislation of convention as may mandarorily apply to the Bills of Lading issued hereunder, shall be deemed to form part of this Charter Party.

"Conwartime 1993"also forms part of this Charter Party.

### Clause 57   War Cancellation:

If major war breaks out between any two or more of the following countries:
United Kingdom, U.S.A., Russia, The People's Republic of China, Japan, directly affecting the performance of this Charter, both the Owners and Charterers shall have the option of canceling this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners, if she has cargo on board, after discharge thereof at destination, or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, of if she has no cargo on board, at a port at which she stays, or if at sea, at a near and safe port as directed by the Charterers. In all cases, hire shall be paid until the Vessel's redelivery.

### Clause 58   Dry-Docking:

Owners have the liberty to dry dock the Vessel.

Owners to give Charterers 60days notice of intention to dry dock, time and place to be mutually agreed


Everwise
International Co., Ltd.

(but always according to vessels class requirements).

From the time of Owners giving 60days notice to dry dock Charterer to work closely with Owners in order to bring the Vessel to Owners desired drydock, by employing the vessel in such business that would bring the vessel at or reasonably near the dry dock/shopyard chosen by Onwers.

Vessel to be placed off-hire from the moment Charterers put the vessel at Owners disposal until vessel is placed again at Charterers disposal in same place as delivery to Owners or in Charterers' option within an equidistance thereto. Owners to keep Charterers updated on a regular basis with vessels status and giving 5days approximate notice of vessel completion. @days after this notice Charterers to advise Owners at what port or position they will take the vessel within the perameters set above.

Owners have the right to place the vessel in dry dock at anytime in case of emergency, with bunkers and time being applied as above.

**Clause 59    Cranes Trouble:**

Vessel is equipped with 5 x 30 metric tons cranes in good working order which are at Charterers' free disposal, whenever required, together with corresponding running gear and with the necessary motive power to work all gear simultaneously.

Charterers shall employ experienced winchmen and/or crane drives at their risk and expenses.

Any time lost as a result of Vessel's power failure, breakdown of cranes and/or gear not caused by default of shore labourers shall not count as laytime, such time lost being calculated pro rata in relation to the total number of cranes on the Vessel.

Should Owners employ equipment in lieu of damaged crane then the vessel not to be considered as off-hire.

Vessel shall give free use, whenever required, of lights as on board to carry on night work.

**Clause 60    Bills of Lading Signature:**

Notwithstanding the provisions of Clause 8, upon request by Charterers, Master and Owners by the way of Master's letter of authorization to authorize Charterers and/or their Agents to sign Bills of Lading for and on behalf of the Master, but always in conformity with Mate's receipts and after presenting the Master with a draft copy of Bills of Lading for his review- this is to protect all parties. No through B/L to be issued.

**Clause 61    Bunkers on Delivery/Redelivery**
Bunkers on delivery as on board except about 500-600MT IFO (380 CST) and about 50-70MT MDO. Quantities on redelivery about same as on delivery prices USD350.- per metric ton for IFO (380 CST) and USD580.- per metric ton for MDO.

Bunker Spec: IFO 180 CST 8217 1996 RME25
            MDO, ISO 8217 DMB or better.

Charterers to supply bunkers always in conformity with sulphur content regulations world wide.

Speed and consumption basis BEAUFOR 4 or below and Douglass Sea State 3 or below.



## ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
## CHARTER PARTY DATED 8TH AUGUST, 2006

---

### Clause 62    Extra Work:

Provided the situation permits, the Vessel's Officers and crew shall perform extra work, if so requested by the Charterers, such as lashing, relashing or ulashing of cargo or collection, restowing of dunnages and/or lashing materials, etc., provided crew are available and willing to perform such work purely in an assisting capacity. Charterers shall pay compensation to Owners for such work, and the amount to be agreed between Master and Charterers before commencement of the work.

### Clause 63    Superficial Inspection:
The Charterers shall have the option of holding a superficial inspection any time of this Charter Party after delivery. The Owners and Master shall give every facility and assistance, which shall not be unreasonably withheld.

On the condition that the normal vessel operation are not affected, the Charterers and/or their supercargoes shall have free and unlimited access to the whole vessel, including bridge, log books, tank plans, calibration scales and/or other plans and are allowed to make of same, to holds and engine room and also to vessel tanks including but not limited to bunkers, lubricating oil, sludge ballast and fresh water tanks, but always excluding crew quarters.

### Clause 64    Hatch Water-Proof Test:
Owners guarantee that Vessel's hatch covers are to be watertight all throughout this Charter period, and if any hatch cover found defective, same to be rectified at Owners' time and expenses to mutually agreed independent surveyor's satisfaction.

### Clause 65    Grab Discharging:
The Vessel shall be suitable for normal size grab discharge, and no cargo shall be loaded in places inaccessible to grab discharge. The Charterers shall have the liberty to use bulldozers with rubber wheels and up to tank top strength in the Vessel's holds at their risk, time and expense.

### Clause 66    Secrecy:
This fixture including rate, terms and conditions is to be kept private and strictly confidential.

### Clause 67    Return Insurance:
Charterers shall have the benefit of any return insurance premium receivable by Owners from their Underwriters by reason of the vessel being in port for a minimum period of 30days if on full hire for this period or pro rata for the time actually on hire, but Owners not to be held responsible for any deficiency in speed/consumption due to foul bottom as a result of prolonged stay in port.

### Clause 68    Off Hire:
Should the Vessel be placed off-hire more than 70 consecutive days, the Charterers have the right to cancel the balance period for this Charter by giving 10 days notice in advance to the Owners without prejudice to any other right the Charterers may have under this Charter providing no cargo on board.

The Charterers may in their option, partly or wholly, add any off-hire period(s) to the time-charterered period, but such option to be declared within 25days after returning to on-hire except after giving first 20days redelivery notice in which case declared on returning to on-hire.

14



**ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC**
**CHARTER PARTY DATED 8TH AUGUST, 2006**

---

**Clause 69    Letter of Indemnity:**
In case that Original Bill(s) of Lading are not available at discharge port, Owners/Master to allow to discharge/deliver the cargo(es) on board against Charterers' Letter of Indemnity with wording as per Owners' P and I Club. Letter of indemnity to be signed by officer or other authorized signatory of Charterers only. Charterers are fully awared the charter chain and the procedures have to be prepared well in advance to the vessel's arrival at discharging port. Attached standard wording shall be used for non-production of Bill of Lading, change of destination and change of destination and non-production of Bill of Lading. Owners reserve their rights to amend this wording at a later date.

**Clause 70    Time Zone:**
Time of delivery and redelivery to be based on G.M.T but laydays/canceling to be based on local time. Hire calculation to be based on G.M.T.

**Clause 71    Protective Clauses:**
New Jason, Both-to-Blame, Conwartime 1993, Chamber of Shipping Nuclear Clause to apply and form part of this Charter Party. All Bill(s) of Lading issued under this Charter shall incorporate the New Jason Clause, Both-to-Blame Collision Clause and Clause Paramount.

**Clause 72    Tax:**
Any tax imposed on account of the Owners, the Vessel, flag, the Charter hire (but only if levied by country of Vessel's domicile) and/or crew to be for Owners' account. Any other taxes or dues or freight taxes on Charterers' business shall be for Charterers' account.

**Clause 73    S.C.I.A:**
The owners and Charterers warrant that they are already signatories to the Sea Carrier Initiative Agreement or will become a signatory on signing this Charter Party or will become signatories should the need arise, and that they will remain signatories during the currency of the Charter and will, at all times, observe the terms of the Agreement.

**Clause 74    Governing Law:**
The Charter Party shall be governed by the English Law.

**Clause 75    Eligibility for Bunkering:**
The Owners guarantee that the Vessel is eligible for bunkers in the United States of America, its territories ladn possessions in accordance with the U.S.Department of Commerce, Office of International Trade, Directive No.705 and U.S.Coast Guard Regulation set forth in Title 33Chapter 1, Part 155-sub-part C and 156 Code of Federal Regulation. The Owners also guarantee that the Vessel is eligible for bunkers in any other country.

**Clause 76    Breaking I.W.L:**
Charterers are allowed to break I.W.L with Owners' prior consent which not to be unreasonably withheld, and Charterers to pay any additional premium for breaking I.W.L. Any extra premium not to be higher than what is quoted by London Underwriters. Break of  I.W.L is allowed only once per annum under Norden operation only.



# ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
# CHARTER PARTY DATED 8TH AUGUST, 2006

**Clause 77    Extra Insurance:**
Any additional insurance levied on vessel to be borne by Owners.
Any additional insurance levied on cargo to be borne by Charterers.

**Clause 78    Panama/Suez Canal Transit:**
The Owners guarantee that the Vessel shall be fully fitted for Panama/Suez Canal, transit and possession of valid necessary certificate during the currency of this Charter to comply with current regulations and requirements of both canals.

**Clause 79    Bimco Standard Stowaway Clause:**
    (A)   1. The Charterers warrant to exercise due care and diligence in preventing stowayas in gaining access to the Vessel by means of secreting away in goods and/or containers shipped by the Charterers.

             2. If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of Charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for Charterers' account and the Vessel shall remain on-hire.

             3. Should the Vessel be areested as a result of the Charterers breach of Charter according to sub-Clause 2 above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the vessel.

    (B)   1. If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines shall be for Owners' account and the Vessel be off-hires.

             2. Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

**Clause 80    Requisition:**
Should the Vessel be requisitioned by the Government of the Vessel's flag during the period of the Charter, the Vessel shall be deemed to be off-hire during the period of such requisition, and any hire paid by the said Government in respect of such requisition period shall be retained by the Owners. However, the Charterers shall have the option to cancel the balance period of this Charter.

**Clause 81    Grain Loading Certificate:**
The Owners guarantee that the Vessel is a self-trimming bulker and shall be suitable for carriage of grain in accordance with Chapter VI of SOLAS when Vessel loads grain in bulk of stowage factor 43 cubic feet per long ton as the heaviest cargo at Summer draught with ends untrimmed.

**Clause 82    Steel Cargoes:**
The steel cargoes are to be stowed, loaded and discharged strictly in accordance with custom of trade and



local regulations and cargo is to be properly dunnaged, chocked up, lashed and secured to independent surveyors and Master's satisfaction at Charterer's time, risk and expense. Charterers must supply sufficient dunnage, lashing materials for loading such cargo. No California Block Stow allowed. Charterers at their expenses and time to appoint local Surveyor/Supercargo at loading port, who is to give assistance/advice to the Master during loading operation. Steel cargoes to be loaded always in conformity with Vessel's tank top strengths. In the unlikely event of any problems en route to discharge ports that involve the cargo shifting or become unsecured/unstable, it is clearly understood that the Master has the right to deviate to a nearby suitable port/place which Master thinks appropriate.

**Clause 83   Bulk Cement Protective Clause:**

A) Charterers undertake the use holds as less as possible, provided vessel's stability, trim and stress permitting.

B) Should any additional/special washdown of holds before loading be required/recommended by independent surveyors appointed by Charterers at their expenses, such washdown to be arranged by Charterers at their expense.

C) After loading, Charterers undertake to arrange at their expense any special/extra trimming and/or leveling of cargo to Master's satisfaction and also Charterers to give reasonable time to allow for the cargo to settle and any air to escape before vessel's departure from loading berth/port.

D) Any extra expenses resulting therefrom/incurred thereby and any detention through any of above causes to be for Charterers' account.

E) Charterers to make best endeavor to use existed cement holes in hatch covers but if the size and location does not match to the loading equipment, Charterers have option to cut cement holes on hatch covers with Owners' prior approval. All cutting and restoring of the holes to be fully supervised/attended/approved by classification surveyor with written documents.

F) Holes no to be cut within the same frame space with the existing grain/cement loading holes and to be cut at the suitable place of hatchcover in accordance with vessel's builder's specification.

G) Protection to bilge well of all holds is strictly necessary to keep smooth suction while discharging hold washing water by using gum tapes (plaster) or so.

H) When restoring cement holes, chill plates or similar material if deemed necessary by Master/surveyor, to be fitted for complete welding in order to reinstate the hatchcovers back to their original condition.

I) After completion of restoration of holes, hose test to be carried out in presence of classification surveyor and the test result should be to his satisfaction. Otherwise the Charterers have the obligation to rectify the situation until and when satisfied by surveyors.

J) Charterers indemnify Owners of all possible cargo solidification, due to hold sweating which is impossible to avoid by proper operation of existing natural ventilation system.

K) All time for preparing, cutting and restoring up to classification surveyor's satisfaction as well as all expenses including classification surveyor's fee and expenses shall be for Charterers' account. Charterers to pay Owners together with next hire payment USD2,000.-per hold if previous cargo bulk cement.

L) Owners/Master shall not be responsible for the result of hold condition after carrying bulk cement.



<u>**Clause 84    Double Banking:**</u>

(A) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size of description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(B) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the owners such advance notice as they reasonably can of the details of any such operations. Any additional fenders required to Master's satisfaction to be provided and paid by Charterers.

(C) Without prejudice to the generality of the Charterers' rights under (A) and (B), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not safe to do so. Master also has the right at any time to order the Vessel to sail if he considers it unsafe for the Vessel to remain double-banking.

(D) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Cahrterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(E) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repair as a result of such operation.

<u>**Clause 85      MDO**</u>

Vessel has the liberty to use diesel oil while entering/leaving port(s), maneuvering in shallow waters, canals, channels and rivers.

<u>**Clause 86      Cable/Victualling/Entertainment:**</u>

Charterers to pay lumpsum of USD1,250.-per month or pro rata for all cable/victualling/entertainment charge.

<u>**Clause 87      A.Q.I.S.:**</u>

The Owners hereby confirm that the Owners duly acknowledge the voluntary guidelines for "controls on the discharge of ballast water and sediments for entering Australia from overseas" stipulated by Australia Quarantine and Inspection Service.

<u>**Clause 88      Documentation**</u>

The Owners must fax Charterers a copy of the Vessel's Certificate of Registry and updated crew list as and when available when requested by the Charterers.

<u>**Clause 89    Hire Payment:**</u>

First hire plus bunkers on delivery quantity to be paid within 3 banking days after vessel's delivery.

Owners' bank details as follows:
HSH Nordbank AG
Gerhart-Hauptmann-Platz 50



# ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
## CHARTER PARTY DATED 8TH AUGUST, 2006

D-20095 Hamburg
Germany
Swift: HSHNDEHH
Navios Shipmanagement Earnings
Account:  1100309183
IBAN:    DE91 2105 0000 1100 3091 83

Corresponding Bank:
JPMorganChase Bank
New York, NY
ABA 021000021
Swift: CHASUS33

Reference: M/V Navios Mercator - CPDD 08/08/06

<u>**Clause 90**</u>    **Aussie/NZ**

Owners guarantee that the Vessel is Australia/New Zealand fitted.

<u>**Clause 91**</u>    **Tank Top:**

Owners guarantee that tank top is flat and suitable for grab discharging in the square of the hatches.

<u>**Clause 92**</u>    **Fresh Water:**

If fresh water used for Charterers' cargo/business, then same to be for Charterers' account.

<u>**Clause 93**</u>    **ISM:**

Owners guarantee that Vessel has "ISM Certificate" on board also Vessel will be compliant with the ISM Code with appropriate certification by international recognized organization during the Charter Period.


**BIMCO ISM CLAUSE:**

From the date of coming into force of the International Safety Management(ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Expect as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners of "the Company" to comply with ISM Code shall be for the Owners' account.


<u>**Clause 94**</u>    **Grabs:**

Charterers can use Vessel's grabs without any additional fee, however, experienced shore labor and equipment always to be appointed and paid by Charterers.

<u>**Clause 95**</u>    **I.T.F Clause:**

Owners warrant that the Vessel's crew are always employed under terms/conditions acceptable to ITF or its affiliates. Any cost or loss of time due to Owners; failure to comply with the above to be for Owners' account.



**Clause 96      Lien:**

In addition to the right of lien conferred on the Owners according to the provisions of the Charter Party lien clause, the Owners also to have a lien over bunkers on board, as well as over any sums due to Time Charterers under any sub-Charter Parties (in addition to freights and sub-freights), for any amounts due under this charter-party. Further, in the event of the Owners' exercise of their liability to withdraw the vessel in accordance with the provisions of the charter Party withdrawal clause, the ownership of any bunkers remaining on board shall thereupon vest in Owners' shall allow to Time Charterers by way of credit against any sums due to Owners the value of such bunkers calculated in accordance with the provisions of the charter-party bunkers clause applicable on redelivery.

Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the vessel.

**Clause 97      Seaworthy Trim:**

Charterers shall leave the vessel in seaworthy trim and with cargo on board safely stowed to Master's satisfaction between loading berth/ports and between discharging berth/ports, respectively; any expenses resulting therefrom shall be for Charterers' account and any time used shall count.

**Clause 98      BIMCO ISPS Clause:**

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter IX of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and " the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or " the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contace details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners."

(ii) Except as otherwise provided in this Charter party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(C) Notwithstanding anything else contained in this Charter Party, all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be


Everwise
International Co., Ltd.

## ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC CHARTER PARTY DATED 8TH AUGUST, 2006

for the Charterers' account, unless such costs or expenses result solely form the Owners' negligence. All measures required by the Owners to comply with Ship Security Plan shall be for the Owners' account.

(D) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 99    NAABSA Clause:**
NAABSA to be allowed in Brazil, Argentina and Uruguay only, once per annum.

**Clause 100    AMS Clause:**
1.    Carrier under RAEPCI:
In respect of cargo loaded for the U.S. or in transit on the Vessel through the U.S., including any U.S. territory, the Owners shall be considered "Carriers" for the purpose of U.S. Customs Regulation entitled "Required Advance Electronic Presentation of Cargo Information"("RAEPCI") and be responsible for the following items as required and defined by RAEPCI:

(a)  filing the Vessel manifest electronically via the Vessel Automated Manifest System("Vessel AMS");
(b)  obtaining a "Standard Carrier Alpha Code"("SCAC"); and
(c)  obtaining an "international carrier bond" ("ICB")

2.    SCAC:
Where the Owners and/or their agents issue Bills of Lading or other relevant documents of carriage ("Bills of Lading'), the Owners shall include their SCAC on each Bill of Lading to be used in respect of cargo destined for delivery at a U.S. port. In the event that this Charter Party grants the Charterers or their Agents the right to issue Bills of Lading for and on behalf of the Master and the Owners, the Owners shall provide to the Charterers, the Owners' SCAC Code which is to be used by the Charterers and/or their Agents in preparing the Bills of Lading. Each Bill of Lading issued by the Charterers and/or their Agents shall include the Owners' SCAC Code followed by a unique identifier consisting of up to 12 alpha or numeric charterers.

3.    Breakbulk Cargo-Exemption:
(a)  In the event breakbulk cargo is to be loaded destined for the U.S., the Owners shall, forthwith, on request of the Charterers, apply to the U.S. Customs Service or other appropriate authority for an exemption to the requirement of U.S Custom Regulation (19 CFR 4.7) or any subsequent amendment thereto.

(b)  Provided the Owners have acted promptly in response to such request, the owners shall not be responsible for any delay in or caused by the processing or granting of the exemption or the failure to obtain an exemption or any losses whatsoever arising our of such delay or failure.

4.    Bulk and Exempt Breakbulk Cargo Destined for the U.S.:
(a)  If loading bulk cargo or exempt breakbulk cargo destined for the U.S., the Charterers shall, not later than 48 hours in advance of the ETA at the first U.S. port of call, provide to Owners all information required by U.S. bureau of Customs and Border Protection("ICB") Form 1302 along with the information required by 19 CFR 4.7a (c)(4) or any amendments thereto to enable the Owners and/or their Agents to submit a timely and accurate automated cargo manifest via the Vessel AMS directly to the CBP.

(b)  Provided that the Charterers give to the Owners all information required as stated in 4(a), the Owners shall submit the cargo manifest to the U.S. Customs latest 24hours in advance of the arrival of the Vessel at the first U.S. port of call.



## ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
## CHARTER PARTY DATED 8TH AUGUST, 2006

5. Non-exempt Breakbulk Cargo Destined for the U.S.:

(a) If loading breakbulk cargo destined for the U.S in respect of which no exemption has been obtained, the Charterers shall provide to the Owners all information referred to in 4(a) not later than 48 hours and have obtained the exemption referred to in paragraph 3 above.

(b) Provided that the Charterers give to the Owners all information required as stated in 4(a), the Owners shall submit the cargo manifest to the U.S. Customs latest 24hours in advance of loading.

6. Foreign Remaining on Board("FROB")

(a) If loading bulk cargo or breakbulk cargo carried on the Vessel in transit to a foreign destination, the Charterers shall, in respect of all bulk and breakbulk cargoes carried on the Vessel through U.S.ports in transit, provide to the Owners all information referred to in 4(a) not later than 48hours in advance of the expected commencement of loading at the foreign port.

(b) Provided that the Charterers give to the Owners all information required as stated in 4(a), the Owners shall submit the cargo manifest to the U.S.Customs latest 24hours in advance of loading.

7. Costs, Expenses, Penalties, Delays, Etc.:

(a) Notwithstanding anything else contained in this Charter Party, all costs and charges associated with the procurement of an ICB as defined by the RAEPCI for calling at any U.S. port and the filing of the AMS, incurred in respect of the particular voyage to the United States, shall be for Charterers' account.

(b) The Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever(including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with its obligations under this Clause.

(c) If the Vessel is delayed, detained, attached, seized or arrested as a result of the Charterers' failure to comply with its obligations under this Clause, the Charterers shall provide a bond or other appropriate security to ensure the prompt release of the Vessel. Notwithstanding any other provision in this Charter Party to the contrary, the Vessel shall remain on hire and any delay or time lost shall be entirely for the Charterers' risk and account, unless delay has been caused by the Owners' breach of its obligations hereunder.

8. Legislative, Regulatory & Practical Notification of Changes:

(a) In the event that a written notification is received in sufficient time from CBP to the effect that the Charterers may be considered to be "Carrier" for the purposes of RAEPCI, then the Charterers shall undertake the obligations and duties of Carrier as set out in the FAEPCI, more particularly described above.

(b) In addition, the Charterers shall instruct the Owners to insert the Charterers' SCAC Code on the Bills of Lading, notwithstanding that the Owners will remain the contractual Carrier under the Bills of Lading.

(c) In the event that paragraph 8 shall apply, the Owners will provide the Charterers with their full cooperation, including, but not limited to, the use of the Vessel AMS.



**Clause 101**     **REDELIVERY RANGE**

Redelivery range: Dropping last outward sea pilot one safe port:-

- PMO/Singapore/Japan range including south Korea/People of Republic China/Taiwan/Philippine/Indonesia/Malaysia/Australia.

- Boston/Bahia Blanca range including north coast south America/Caribbean sea.

- Skaw/Passero range including U.K/ continient/Eire/Morocco/full Mediterranean.

- Vancouver/San Diego range

Port in Charterers' option, any time day or night, Sundays and Holidays included.

**OWNERS:**                                                      **CHARTERERS:**



**CANADIAN CLUASE PARAMOUNT:**

All the terms, provisions and conditions of the Canadian Water Carriage of Goods Act, 1936 and the Rules comprising the schedule thereto are, so far as applicable, to govern the contract contained in this Bill of Lading and the Shipowners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the Schedule thereto as if the same were herein specifically set out. If anything herein contained be inconsistent with the said provision, it shall to the extent of such inconsistency and no further be null and void.

The Carrier shall be under no responsibility whatsoever for loss of damage arises prior to the loading on and/or subsequent to the discharge from the Carrier's ship.

**U.S.A CLAUSE PARAMOUNT:**

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 1, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall(except as my be otherwise specifically provided herein)govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier.

**GENERAL PARAMOUNT CLAUSE:**

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the Carriage of Goods by Sea which incorporates the Rules relating to Bills of Lading contained in the International Convention, dated Brussels, 25th August, 1924 and which is compulsorily applicable to the Contract of Carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing, contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of is responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of liability.

**BOTH TO BLAME COLLISION CLAUSE**
If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following Clause shall apply;

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier."

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or



# ADDITIONAL CLAUSES TO M.V. "NAVIOS MERCATOR"/KLC
# CHARTER PARTY DATED 8TH AUGUST, 2006

ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE
The General Average shall be payable according to the York/Antwerp Rules 1974 but where the adjustment is made in accordance with the law and practice of the United Sates of America, the following Clause shall apply;

## NEW JASON CLAUSE
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which or for the consequence of which the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

And the Charterers shall ensure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## U.S.A CLAUSE PARAMOUNT
This Bill of Lading shall have effect subject to the provisions of any legislation relating to the Carriage of Goods by Sea Act of the United States, approved April 16th, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier. The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993

## CODE NAME: CONWARITME 1993
1. For the purpose of this Clause, the words:

   (A) "Owners" shall include the Ship Owners, bareboat Charterers, Disponent Owners, Managers or other operators who are charged with the management of the Vessel and the Master, and

   (B) "War risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners, may be dangerous or are likely to be or the become dangerous to


Everwise
International Co., Ltd.

the Vessel, her cargo, crew or other persons on board the vessel.

2. The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgment of the Master and/or Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3. The Vessel shall not be required to load contraband cargo, or to pass through any blockade whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to any area where she shall be subject, or is likely to be subject to a belligerent right or search and/or confiscation.

4.  (A) The Owners may effect war risks insurance in respect of the Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof shall be for their account.
    (B) If the Underwriters of such insurance require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War risks, then such premiums and/or calls shall be reimbursed by the Charterers to the owners at the same time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimburse to the Owners by the Charterers at the same time as the next payment of hire is due

6. The vessel shall have the liberty:

    (A) To comply with all orders, directions, recommendations or advice as to departure, arrival routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

    (B) To comply with all orders, directions, recommendations of any war risk underwriters who have the authority to give the same under the terms of the war risk insurance;

    (C) To comply with the terms of any resolution of the security council of the united national, any directives of the European community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

    (D) To divert and discharge at any other port any cargo or part thereof which may tender the vessel liable to confiscation as a contraband carrier;

    (E) To divert and call at any other port to change the crew or any part thereof other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.



---

7. If in accordance with their rights under the foregoing provisions of this clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nominations by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their Owner choice

8. If in compliance with any of the provisions of sub-clauses (2) to (7) of this clause anything is done or not done. Such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

= E N D =


Everwise
International Co., Ltd.